UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cr-30044-MGM |
| | ) | |
| [1] ALBERTO MARTE, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cr-30044-MGM |
| | ) | |
| [8] JUAN PEREZ, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' RENEWED
MOTION FOR DISCOVERY
(Dkt. No. 521)

ROBERTSON, U.S.M.J

I.    INTRODUCTION

This matter is before the court after an evidentiary hearing on Defendant Alberto Marte's

and Defendant Juan Perez's (collectively "Defendants") renewed motion for discovery of

information regarding a possible joint investigation between the United States Drug Enforcement

Administration ("DEA") and law enforcement authorities in the Dominican Republic.  After

hearing the testimony of DEA Special Agent ("SA") John Barron and considering the parties'

arguments, the Defendants' renewed motion is DENIED for the reasons that follow.

II.   PROCEDURAL AND FACTUAL BACKGROUND

A.   Pre-Evidentiary Hearing

Defendant Alberto Marte is charged in a second superseding indictment with one count of conspiring to distribute heroin and to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846, two counts of aiding and abetting distribution of heroin and possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2, four counts of distribution of heroin and possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841, one count of conspiring to distribute fentanyl and to possess fentanyl with intent to distribute, in violation of 21 U.S.C. § 846, and one count of possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924 (Dkt. No. 300).  The same indictment charges Defendant Juan Perez with one count of conspiring to distribute heroin and to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846 (*id.*).  *See United States v. Marte*, Case No. 16-cr-30044-MGM, 2018 WL 988062, at *1 (D. Mass. Feb. 20, 2018), *adhered to on reconsideration*, Case No. 16-cr-30044-MGM, 2018 WL 1174202 (D. Mass. Mar. 6, 2018).  The charges were based on Defendants' alleged participation in a "large-scale narcotics trafficking organization" that was operating in Springfield, Massachusetts.  *Id.*

Defendants moved to compel the government to produce information regarding a wiretap authorized by a judge in the Dominican Republic ("Dominican wiretap") that intercepted two of Defendant Marte's conversations with the target of a Dominican investigation on the ground that it was a joint investigation between the DEA and law enforcement authorities in the Dominican Republic (Dkt. No. 342 at 5).  *See Marte*, 2018 WL 988062, at *2-4.  The DEA mentioned Marte's intercepted conversations in its initial application to the Massachusetts District Court under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18

2

U.S.C. §§ 2510-2520, for authorization to intercept the Springfield organization's wire and electronic communications ("Massachusetts wiretap").  *See id.* at *3.

In order to rule on Defendants' motion to compel, the court needed additional factual information to determine whether or not the DEA and Dominican officials were engaged in a joint investigation when Defendant Marte's communications were intercepted by Dominican authorities pursuant to a Dominican judge's order(s).  *See id.* at *4 (citing *United States v. Valdivia*, 680 F.3d 33, 52 (1st Cir. 2012)).  Consequently, on January 23, 2018, the undersigned directed the government to provide responses to the following inquiries "in the form of an affidavit from a representative of the DEA with personal knowledge:"

1.  Did the DEA initiate the investigation in the Dominican Republic that led to the interception of Defendant Marte's communications with a target of the Dominican wiretap?

2.  Did the DEA request that Dominican officials apply for the court order authorizing the Dominican wiretap that intercepted Defendant Marte's communications?

3.  Did DEA agents supervise, direct, or control the Dominican wiretap that intercepted Defendant Marte's communications with a target of the Dominican wiretap?

4.  Did DEA agents personally participate in intercepting and recording Defendant Marte's communications with a target of the Dominican wiretap?

(Dkt. No. 394).

On February 14, 2018, the government responded to the court's inquiries by submitting the affidavit of SA Barron who participated in the Massachusetts investigation into Defendants' activities (Dkt. Nos. 414, 414-1).  SA Barron's attestations were based on his personal knowledge of the investigation and information he obtained from other DEA personnel (Dkt. No. 414-1 at ¶ 3).  SA Barron stated that he was "confident that [he had] communicated with all those

3

persons within the DEA having the most relevant information" concerning the court's order (*id.*).

SA Barron answered the court's four queries in the negative (*id.* at ¶¶ 4-7).

After considering Defendants' motion, the government's opposition, and SA Barron's affidavit, the undersigned denied Defendants' motion to compel (Dkt. No. 424).  *See Marte*, 2018 WL 988062, at *4-5.

Defendants appealed this court's ruling to the presiding District Court judge (Dkt. No. 445).  Defendants argued, in part, that SA Barron had failed to adhere to the court's directive to answer the four questions based on his "personal knowledge" (Dkt. No. 446 at 16).  Defendants requested an evidentiary hearing in order to test the reliability of the hearsay upon which SA Barron relied (*id.* at 17).  The presiding judge set aside this court's order denying Defendants' motion to compel discovery regarding a joint investigation, and remanded the matter for the undersigned to consider whether to hold an evidentiary hearing (Dkt. Nos. 494).  After granting Defendant Marte's motion to join Defendant Perez's renewed motion for discovery and considering the parties' submissions and oral arguments, the court allowed Defendants' request for an evidentiary hearing to determine whether Defendants were entitled to discovery concerning the Dominican wiretap that intercepted Defendant Marte's conversations (Dkt. Nos. 521, 539, 549, 560).

B.    Evidentiary Hearing

The court held an evidentiary hearing on August 21, 2018 (Dkt. No. 562 at 1).[1]

Defendants called SA Barron to testify regarding the information he provided in the affidavit submitted in response to the undersigned's questions aimed at determining whether or not the United States and the Dominican Republic engaged in a joint investigation (*id.* at 7, 8, 9).

---

[1] The transcript of the hearing testimony is referenced herein as "Dkt. No. 562 at page ___."

Defendants' case in Massachusetts followed investigations that were conducted, first, in the Dominican Republic and, then, in New York (*id.* at 10, 33, 35-36, 50).  Sergio Gomez Diaz, a Dominican national, was the focus of the investigation in the Dominican Republic (*id.* at 31-32, 50).  Gomez Diaz brokered sales of cocaine and heroin that came from Venezuela into the Dominican Republic and, from there, were transferred to participants in a narcotics operation in the United States, including a member of Gomez Diaz's family in New York (*id.* at 14-15, 33-34, 46).

Because Defendants asked the court to order the government to disclose the "nature of the assistance" the DEA's Special Operations Division ("DEA SOD") provided to the alleged joint investigation conducted by the Dominican authorities and the DEA (Dkt. No. 342 at 5), SA Barron sought the assistance of Cara Krysil, the DEA Division Council in Boston (Dkt. No. 562 at 12-13, 36).[2]  At SA Barron's request, Attorney Krysil contacted Attorney Robert McGovern, the Division Counsel of the DEA SOD, who spoke to "several people" involved in the investigation (*id.* at 29).  According to the information that Attorney McGovern provided to Attorney Krysil, the DEA SOD did not convey any leads or information about the Dominican case to the Dominican authorities, played no role in initiating the investigation in conjunction with the Dominican authorities, and did not participate in a joint investigation (*id.* at 29, 37).  SA Barron reported that the DEA SOD's role in the Massachusetts case was limited to acting as "an

---

[2] Defendants moved to compel the government to disclose "written documentation created by the DEA [SOD] related to [Defendants' case] and any parallel investigation" (Dkt. No. 326 at 6 ¶¶ 14, 16).

intermediary between the DEA investigators in Massachusetts, New York, and the Dominican Republic" (*id.* at 37).[3]

Attorney Krysil also contacted the United States Country Attaché in the DEA's Dominican Republic office who had knowledge of American policies that were pertinent to the Defendants' discovery requests and the court's questions (Dkt. No. 562 at 15, 30).[4]  According to the information Attorney Krysil provided to SA Barron, the Country Attaché reported that "the DEA does not initiate investigations in the Dominican Republic" (*id.* at 38).  SA Barron testified that the Country Attaché did not participate in the investigations in the Dominican Republic, New York, or Massachusetts (*id.* at 38).

SA Barron also contacted the following DEA agents who, he believed, would have the most relevant and accurate information regarding the four questions posed by the court in January 2018:  SA Manuel Rego, the lead investigator in the related New York case, who had direct dealings with investigators in the Dominican Republic and who had shared information with SA Barron; and SA Roxana Pulido, the resident agent in the DEA's country office in Santo Domingo, Dominican Republic, who was the DEA's lead investigator in the Gomez Diaz case in the Dominican Republic and who passed information from Dominican law enforcement authorities to SA Rego in New York in 2015 or 2016 (*id.* at 13, 16, 33-36, 43).

SA Pulido and SA Rego provided SA Barron with background information about the genesis of the investigation in the Dominican Republic that included the Dominican wiretap (*id.*

---

[3] According to SA Barron, the DEA SOD "primarily acts as a liaison [or intermediary] between . . . offices" of the DEA to promote information sharing (Dkt. No. 562 at 14, 27-29).

[4] Defendants originally moved to compel the government to produce "[a]ny . . . memorand[a] of understanding, mutual recognition arrangements, [or] joint work plans . . . created by the . . . [SOD]" related to the Dominican investigation (Dkt. No. 326 ¶¶ 14, 16).

at 39).  SA Pulido informed SA Barron that Dominican law enforcement authorities began investigating Gomez Diaz after they seized an airplane that was being used to transport narcotics between Venezuela and the Dominican Republic (*id.* at 50).  SA Barron testified that the DEA was not involved in the seizure of the plane (*id.*).

Gomez Diaz was the target of the Dominican wiretap that a Dominican judge authorized in January 2015 (*id.* at 9, 32, 39, 41).  Based on his inquiries of SA Pulido and SA Rego regarding the Dominican wiretap, SA Barron learned that DEA agents or other United States government agents had not:  contributed any information that was used to obtain the wiretap; asked the Dominican authorities to apply for the court order authorizing the wiretap; participated in applying for the wiretap; or supervised, directed, or controlled the interceptions (*id.* at 23, 34, 39-40, 49).

SA Pulido told SA Barron that she played no role in initiating or conducting the Dominican wiretap of Gomez Diaz and was not aware of it when the interceptions began (*id.* at 47, 48-49).  Instead, she learned of the wiretap when the Dominican authorities notified her that Gomez Diaz had contact with individuals whose phones had United States area codes (*id.* at 47-48).

SA Pulido and the DEA SOD disseminated information SA Pulido learned from the Dominican investigators to SA Rego in New York (*id.* at 35-36).  SA Barron estimated that the New York investigation into the narcotics organization began in late 2015 (*id.* at 27, 34, 39).

In January 2016, a few months after the New York investigation began, SA Barron began investigating Defendants' involvement in a narcotics trafficking organization in Springfield based on information that he received from the DEA's New York office and information that he gathered on his own (*id.* at 9, 10, 22, 33).  On March 16, 2016, SA Barron learned that Defendant

Marte was intercepted by the Dominican wiretap during two conversations with Gomez Diaz that

occurred at the beginning of March 2016 (*id.* 40, 41).  SA Barron stated that Dominican

authorities intercepted and recorded Defendant Marte's conversations without DEA agents'

participation (*id.* at 41).  Dominican authorities shared Gomez Diaz's background information

with SA Barron (*id.* at 43).  SA Barron applied for the Massachusetts wiretap in mid-April 2016

(*id.* at 10).

    III.    <u>LEGAL STANDARDS</u>

    A.    <u>Discovery</u>

Defendants cite *Brady v. Maryland*, 373 U.S. 83 (1963), corresponding LR 116.2(A)(2),

and Fed. R. Crim. P. 16(a)(1)(E), to support their request for information concerning the

Dominican wiretap of Gomez Diaz (Dkt. No. 342 at 2).

    1.    *Brady v. Maryland* and LR 116.2

"In a line of cases beginning with *Brady,* the Supreme Court has made clear that the

prosecution in a criminal case has an affirmative duty to disclose information in its possession

that is favorable to the defendant and material to the question of guilt or punishment."  *United*

*States v. Tsarnaev*, Criminal Action No. 13-10200-GAO, 2013 WL 6196279, at *1 (D. Mass.

Nov. 27, 2013) (citing *Kyles v. Whitley,* 514 U.S. 419, 432–33 (1995)).  *See also United States v.*

*Prochilo,* 629 F.3d 264, 268 (1st Cir. 2011).  "Evidence is 'material' for these purposes only if

there is a reasonable probability that it could affect the outcome of the trial."  *Tsarnaev,* 2013

WL 6196279, at *1 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)).  This

information, otherwise known as "*Brady* material," "falls into one of two categories — that

which tends to be more or less directly exculpatory in that it casts doubt on the defendant's guilt,

and that which is indirectly exculpatory in that it tends to impeach the reliability of other

prosecution evidence." *Id.* Defendants' right to the disclosure of favorable evidence, however, does not "create a broad, constitutionally required right of discovery." *Bagley*, 473 U.S. at 675 n.7.

This Court's Local Rule 116.2(a)(2), upon which Defendants rely, defines "[e]xculpatory information" as "information that is material and favorable to the accused and includes, but is not necessarily limited to, information that tends to: . . . cast doubt on the admissibility of evidence that the government anticipates using in its case-in-chief, that might be subject to a motion to suppress or exclude, which would, if allowed, be appealable pursuant to 18 U.S.C. § 3731." LR 116.2(a)(2). The local rules require the government to provide this material as part of its automatic discovery. *See* LR 116.1(c)(1), 116.2(b)(1)(B).

### 2. Fed. R. Crim. P. 16(a)(1)(E)

"[U]nlike the Government's *Brady* obligation to disclose exculpatory evidence . . . Rule 16 requires the disclosure of inculpatory and exculpatory evidence alike." *United States v. Poulin*, 592 F. Supp. 2d 137, 143 (D. Me. 2008) (citing *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998)) (citation omitted). Federal Rule of Criminal Procedure 16(a)(1)(E) states, in relevant part:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense; . . . .

Fed. R. Crim. P. 16(a)(1)(E). "The defendant, as the moving party, bears the burden of showing materiality." *United States v. Goris*, 876 F.3d 40, 44 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 2011 (2018). "A showing of materiality requires 'some indication' that pretrial disclosure of the information sought 'would have enabled the defendant significantly to alter the quantum of proof

in his [or her] favor.'"  *Id.* at 45 (quoting *United States v. Ross*, 511 F.2d 757, 763 (5th Cir.

1975)).  "If . . . a defendant's discovery request is grounded in a speculative theory, a district

court's decision to deny that request is not an abuse of discretion."  *Id.*

       B.    <u>Hearsay</u>

At the conclusion of the evidentiary hearing, Defendant Perez, through counsel, moved to

strike all of SA Barron's hearsay testimony on the ground that it was inadmissible (Dkt. No. 562

at 57).[5]  Defendants cited no authority for their position (*id.* at 53-54).

Defendants appear to be claiming that they were deprived of their Sixth Amendment right

to confront witnesses against them when SA Barron testified to information that SA Pulido, SA

Rego, and Attorney Krysil conveyed to him.  *See* Fed. R. Evid. 801(c) ("'Hearsay' means a

statement that:  (1) the declarant does not make while testifying at the current trial or hearing;

and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

The court disagrees.  The Sixth Amendment states, in relevant part, that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him . . . ."  U.S. Const. amend. VI.  "The Confrontation Clause's 'central concern . . . is to ensure

the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in

the context of an adversary proceeding before the trier of fact.'"  *United States v. McKeeve*, 131

F.3d 1, 8 (1st Cir. 1997) (quoting *Maryland v. Craig,* 497 U.S. 836, 845 (1990)).  "The Clause

addresses that concern principally by affording a criminal defendant the right to confront

appearing witnesses face to face and the right to conduct rigorous cross-examination of those

---

[5] Because Defendant Marte joined Defendant Perez's motion (Dkt. No. 560) and agreed with
Defendant Perez's counsel's argument at the conclusion of the evidentiary hearing (Dkt. No. 562
at 57), the court considers the motion to strike hearsay objection as having been advanced by
both Defendants.

witnesses." *Id.*  The right of confrontation is not absolute, however.  *See Abram v. Gerry*, 672

F.3d 45, 49 (1st Cir. 2012).  The exceptions to the hearsay rule permit courts to admit for their

truth the out-of-court statements of declarants who do not testify at trial.  *See* Fed. R. Evid. 801-

807.  *See also United States v. Bauzo-Santiago*, 49 F. Supp. 3d 155, 157 (D.P.R. 2014) ("Hearsay

evidence is inadmissible unless a federal statute, the Federal Rules of Evidence, or rules

prescribed by the Supreme Court provide otherwise.") (citing Fed. R. Evid. 802).

       Moreover, the right of confrontation does not apply to the same extent at proceedings

other than trials because "the interests at stake . . . are of a lesser magnitude than those in the

criminal trial itself." *United States v. Raddatz*, 447 U.S. 667, 679 (1980).  For example, it is

well-settled that "the rules of evidence normally applicable to criminal trials do not operate with

full force at hearings before the judge to determine the admissibility of evidence." *United States*

*v. Matlock*, 415 U.S. 164, 172-73 (1974).  *See McCray v. Illinois*, 386 U.S. 300, 312-13 (1967)

(at a pretrial suppression hearing, the arresting officer was permitted to testify to the out-of-court

statements made by an unidentified informer).  Rule 1101(d)(3) of the Federal Rules of Evidence

states that, with the exception of the rules on privilege, the rules of evidence do not apply to

"miscellaneous proceedings" such as:  "extradition or rendition; issuing an arrest warrant,

criminal summons, or search warrant; a preliminary examination in a criminal case; sentencing;

granting or revoking probation or supervised release; and considering whether to release on bail

or otherwise." Fed. R. Evid. 1101(d)(3).  Because the hearing in the instant case was analogous

to a suppression hearing or the examples of the miscellaneous proceedings cited in the rule, the

court is permitted to consider the hearsay testimony of SA Barron.  *See Raddatz,* 447 U.S. at 679

("At a suppression hearing, the court may rely on hearsay and other evidence, even though that

evidence would not be admissible at trial."); *Goris*, 876 F.3d at 45 (district court judge, who held

an evidentiary hearing on defendant's discovery motion, found the government's affidavit credible); *United States v. Saccoccia*, 62 F. Supp. 2d 539, 543 (D.R.I. 1999) (the court rejected defendant's request to strike an FBI agent's affidavit submitted in support of forfeiture on the ground that it was not based on the agent's personal knowledge and found that "[a]lthough the Federal Rules of Evidence do not address the precise issue, they expressly state that they are inapplicable to a number of analogous 'miscellaneous proceedings,' including sentencings.") (citing Fed. R. Evid. 1101(d)(3)).

IV.   <u>ANALYSIS</u>

In April 2016, a judge of the United States District Court for the District of Massachusetts issued a Title III order authorizing the Massachusetts wiretap that intercepted Defendants' allegedly incriminating communications. *See Marte*, 2018 WL 988062, at *3. The DEA's application for the court's authorization included Defendant Marte's two conversations with Gomez Diaz that were intercepted by the Dominican wiretap. *See id.* at *2. Defendants seek to use information related to the initiation of the Dominican wiretap as a platform to attack the order authorizing the Massachusetts wiretap. Defendants posit that if Marte's Fourth Amendment rights were violated by the interception of his communications with Gomez Diaz, this tainted evidence contaminated the evidence derived from the Massachusetts interceptions. Defendants' theory hinges on the existence of a joint investigation between the DEA and Dominican law enforcement that would permit Defendants to challenge the legality of the Dominican wiretap on Fourth Amendment grounds. The government counters that Defendants are not entitled to the discovery they seek because, after the evidentiary hearing, their joint investigation theory remains nothing more than speculation. *See Goris*, 876 F.3d at 45.

A.   <u>Defendants' Standing to Challenge the Legality of the Dominican Wiretap and to Request Discovery Concerning a Joint Investigation</u>

12

"[T]he Fourth Amendment grants protection against unlawful searches and seizures, and evidence obtained in violation of a defendant's Fourth Amendment rights may not be used against him." *United States v. LeClair*, No. 11-CR-39-GZS, 2011 WL 6341088, at *2 (D. Me. Dec. 19, 2011). A wiretap is a search under the Fourth Amendment. *See Berger v. New York*, 388 U.S. 41, 63 (1967). "Ordinarily, the Fourth Amendment's exclusionary rule does not apply to foreign searches and seizures for 'the actions of an American court are unlikely to influence the conduct of foreign police.'" *Valdivia*, 680 F.3d at 51 (quoting *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir. 1983)). *See United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1370 (N.D. Ga. 2001), *report and recommendation adopted* (Aug. 20, 2001) ("[T]he United States Constitution does not normally apply to operations conducted by foreign governments in the enforcement of foreign law, even if the evidence gathered in such operations is used in United States legal proceedings."). There are two exceptions to this rule: "(1) where foreign police conduct 'shock[s] the judicial conscience,' and (2) where American agents 'participated in the foreign search, or . . . [the foreign officers acted] as agents for their American counterparts . . . .'" *United States v. Mitro*, 880 F.2d 1480, 1482 (1st Cir. 1989) (alterations original) (quoting *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976)). Courts examine the following factors to determine if American and foreign authorities were engaged in a joint investigation, such as the one Defendants allege may have occurred here: (1) whether American authorities initiated the investigation in the foreign country; (2) whether American authorities were involved in the decision to seek the foreign wiretap; (3) whether American agents controlled, directed, or supervised the foreign wiretap; and (4) whether American agents participated in "the implementation of the wiretaps and recording of conversations." *Valdivia*, 680 F.3d at 52. *See United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992); *Marte*, 2018 WL 988062, at *4.

If United States law enforcement officials conduct interceptions in cooperation with foreign authorities thereby triggering the Fourth Amendment's protections, a defendant who has standing is entitled to challenge the wiretap's legality on Fourth Amendment grounds. *See United States v. Santana*, 218 F. Supp. 2d 53, 55-56 (D.N.H. 2002); *United States v. Castro*, 175 F. Supp. 2d 129, 132 (D.P.R. 2001).

> In analyzing questions of standing, "[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."

*United States v. Charles*, No. Crim. 97-10107-PBS, 1998 WL 204696, at *11 (D. Mass. Jan. 13, 1998), *aff'd,* 213 F.3d 10 (1st Cir. 2000) (quoting *Alderman v. United States,* 394 U.S. 165, 171–72 (1969)). *See United States v. Kimball,* 25 F.3d 1, 5 (1st Cir. 1994) ("Fourth Amendment rights are personal, and a proponent of a motion to suppress must prove that the challenged governmental action infringed upon his own Fourth Amendment rights."); *United States v. Cruz,* 594 F.2d 268, 274 (1st Cir. 1979) ("The fourth amendment's protection against search by electronic surveillance does not extend to one whose conversations were not involved in the wiretap."); *United States v. Plotkin,* 550 F.2d 693, 695 (1st Cir. 1977) (same).

There is no dispute that Defendant Marte's conversations were intercepted during the wiretap that was authorized by a Dominican judge. Defendant Perez, however, has neither alleged nor presented any evidence showing that any conversations to which he was party were intercepted during the Dominican wiretap.[6] Consequently, even if the DEA and the Dominican

---

[6] Defendant Perez claims that he is entitled to discovery regarding the Dominican wiretap in order to determine whether he was intercepted, and if he was, he would have standing. Defendant Perez's reasoning is misguided. Basically, he is arguing that he is entitled to discovery to determine if the discovery he seeks is material. If Defendant Perez's contention is

authorities were engaged in a joint investigation, Defendant Perez lacks standing to challenge the Dominican wiretap order on Fourth Amendment grounds and he is not entitled to compel the government to disclose the material at issue here. *See United States v. Torres*, Criminal Action No. 1:06-CR-00351-WSD-LTW, 2008 WL 11380071, at *9 (N.D. Ga. Mar. 20, 2008*), report and recommendation adopted*, 1:06-cr-351-WSD, 2008 WL 11380103 (N.D. Ga. Oct. 9, 2008) (denying defendants' motion to compel production of un-redacted wiretap authorizations referenced in wiretap applications approving interceptions of defendants' communications because defendants made "no assertion that they were a party to the wiretap authorizations they [sought], which call[ed] into question their ability to challenge the authorizations should they [have] obtain[ed] such discovery."). Accordingly, Defendant Perez's renewed motion for discovery is denied.

       B.     <u>Discovery Concerning a Joint Investigation</u>

As discussed earlier, Defendants sought access to information concerning the Dominican wiretap in order to assess whether the interception of Defendant Marte's communications violated his Fourth Amendment rights. The parties do not quarrel about the propriety of the factors that the court should consider when determining whether or not the DEA was engaged in a joint investigation with law enforcement authorities from the Dominican Republic. Defendants contend that the information SA Barron provided regarding the factors was unreliable. After considering SA Barron's sworn testimony, the court finds it to be credible and reliable.

---

extended to its logical conclusion, it would eliminate the materiality requirement of Fed. R. Crim. P. 16(a)(1)(E).

Consequently, Defendant Marte has failed to establish that he is entitled to the discovery he seeks.[7]

SA Barron had personal knowledge of information concerning the Massachusetts investigation (Dkt. No. 414-1 ¶¶ 2, 3).  Because he did not have all the answers to the questions posed by the undersigned, however, he contacted DEA personnel who, he believed, had knowledge about the investigation in the Dominican Republic, including the wiretap of Gomez Diaz, and who could answer the court's questions accurately (Dkt. No. 562 at 43).  SA Pulido was the agent in the DEA's resident office in Santo Domingo (*id.* at 13, 16, 34-36, 43).  As the DEA's lead investigator in the Gomez Diaz case in the Dominican Republic, she had first-hand knowledge of the timing and extent of the DEA's involvement in the investigation (*id.* at 34-35). In January 2015, a Dominican judge authorized the interception and recording of Gomez Diaz's communications after -- and because -- Dominican authorities seized a plane carrying drugs from Venezuela to the Dominican Republic (*id.* at 9, 32, 39, 50).  According to SA Barron, the DEA did not participate in capturing the plane (*id.* at 50).  SA Pulido reported that she did not direct the Dominican authorities to initiate the wiretap or participate in conducting it (*id.* at 40, 47-49). Indeed, she had no knowledge of the Dominican wiretap at the time of its inception (*id.* at 40, 47).  She only learned of its existence when, according to their usual practice, the Dominican authorities notified her that Gomez Diaz had communicated with individuals with area codes in the United States (*id.* at 47-49).

---

[7] If Defendant Perez had standing to challenge the Dominican wiretap, which he does not, his renewed motion for discovery would nonetheless be denied for the reasons that Defendant Marte's renewed motion is denied.

Around late 2015, SA Pulido and the DEA SOD passed on information about the Dominican investigation to SA Rego, the lead investigator in the related New York case (*id.* at 13, 26-27, 33-36, 39).  At that point, the Dominican wiretap had been operating for almost a year (*id.* at 39).  SA Rego told SA Barron that he did not initiate the Dominican investigation into Gomez Diaz (*id.* at 23).

SA Barron received information from SA Rego, obtained information on this own, and began the Massachusetts investigation in January 2016 (id. at 9, 10, 22, 23, 39).  SA Barron was not aware of the Dominican wiretap when he initiated his investigation (*id.* at 10-12).  Defendant Marte was intercepted by the Dominican wiretap in early March 2016, about two months after SA Barron commenced his investigation and more than one year after the inception of the Dominican wiretap (*id.* at 40, 41).  SA Barron testified that, based on his knowledge, DEA agents did not participate in the Dominican interception and recording of Defendant Marte's conversations (*id.* at 41).

Information gleaned by Attorney Krysil was consistent with what SA Pulido and SA Rego told SA Barron; that is, American agents did not ask Dominican law enforcement authorities to initiate the investigation of Gomez Diaz, did not request that the Dominican authorities seek authorization to intercept his communications, and had no involvement in the wiretap process in the Dominican Republic (*id.* at 23, 39-40, 49).  Attorney McGovern of the DEA SOD reported that the SOD did not supply any leads to Dominican law enforcement agents, and did not participate in any aspect of the Dominican investigation into Gomez Diaz (*id.* at 29, 37).  This information accorded with SA Barron's experience in the instant case where the DEA SOD's role was limited to acting as an intermediary between DEA agents in Massachusetts, the Dominican Republic, and New York (*id.* at 14, 27, 28, 37-38).  Moreover, the information

17

that the County Attaché in the Dominican Republic provided to Attorney Krysil -- that, as a matter of policy, the DEA did not initiate investigations in the Dominican Republic – was consistent with all of the other information SA Barron obtained indicating that there was no joint investigation (*id.* at 38).  *See Valdivia*, 680 F.3d at 52 (there was no active United States participation in an Aruban investigation where Aruban authorities initiated the investigation before American law enforcement personnel arrived in Aruba and American officials did not request, manage, or participate in the wiretap authorized by an Aruban court).

Dominican authorities' sharing of information with the DEA and the DEA's provision of funding, training, and equipment to Dominican law enforcement did not transform the Dominican investigation into a cooperative effort (*id.* at 21, 25, 31, 41-42).  "The fact that Dominican law enforcement authorities shared information with the DEA did not make it a joint investigation."  *Marte*, 2018 WL 988062, at *4 (citing *United States v. Lee*, 723 F.3d 134, 141 (2d Cir. 2013); *Castro*, 175 F. Supp. 2d at 133).  *See United States v. Gomez Castrillon*, No. S2 05 Cr. 156(CM), 2007 WL 2398810, at *4 (S.D.N.Y. Aug. 15, 2007) (although there was information sharing between Columbia and the United States, there was no joint investigation where Columbian authorities conducted their own investigation and the DEA played no role in monitoring wiretaps or translating the results).  Similarly, the fact that the United States provided financial and technical support to the Dominican authorities was not sufficient to transform the Dominican investigation into a joint operation.  According to SA Barron, American assistance to the Dominican Republic was directed at narcotics interdiction in general, not at a particular investigation (*id.* at 25, 41-42).  *See Maturo*, 982 F.2d at 60 (Turkish authorities were not agents of the United States notwithstanding their receipt of "money, information, and wiretapping equipment" from the DEA); *United States v. Cabalcante*, CASE NO. 4:09-CR-194, 2014 WL

12694161, at *6 (E.D. Tex. Feb. 18, 2014) (citation omitted) ("While funding is a factor to be considered in the determining the nature of the relationship, that factor is not dispositive.  More evidence is needed to establish agency or the existence of a joint venture between the DEA and Columbian officials.").  "The investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States . . . ."  *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984).

Defendants argued that because the evidence of a joint investigation is exculpatory, *Brady* and LR 116.2 placed the burden on the government to produce the evidence if it existed (Dkt. No. 446 at 7; Dkt. No. 562 at 60).  Based on SA Barron's testimony, the existence of evidence of a joint investigation is purely speculative.  *See United States v. Connolly*, No. 1:16-CR-00370 (CM), 2017 WL 945934, at *8 (S.D.N.Y. Mar. 2, 2017) ("In contexts other than but analogous to *Brady*, courts have made it clear that the Government's obligation to obtain exculpatory materials held by a foreign agency is (1) triggered only when the Government has engaged in a joint investigation (and not merely a parallel investigation) with that agency; and (2) even then, the obligation is limited to making a request to obtain any exculpatory material located abroad.").  To the extent Defendant Marte argues that the Local Rule shifted the burden from Defendant to the government and required the government to call Dominican authorities as witnesses to negate his speculative theory of a joint investigation, he has pointed to no authority for the proposition that the Local Rule effected such a marked change in pretrial criminal proceedings and the court has found none.  Moreover, in *Mitro*, the First Circuit rejected a similar argument advanced by defendants seeking to challenge the admissibility of evidence derived from a foreign wiretap.  *See Mitro,* 880 F.2d at 1483-84.

Defendant Marte failed to sustain his burden of demonstrating that he is entitled to discover information regarding the Dominican wiretap.  Accordingly his renewed request for discovery is denied.

V.    CONCLUSION

For the foregoing reasons, Defendants' renewed motion for discovery (Dkt. No. 521) is DENIED.

It is so ordered.

Dated:  September 24, 2018                        /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 U.S. MAGISTRATE JUDGE